## FRANKLIN v. CASTLE et al.

No. 13237—Opinion Filed June 10, 1924.

Rehearing Denied Oct. 7, 1924.

Second Rehearing Denied Dec. 16, 1924.

1. **Appeal and Error—Review of Equity Case—Reversal.**

In a case of purely equitable cognizance, it is the duty of this court to review the entire record; and, if it appears that the judgment of the trial court is clearly against the weight of the evidence, to reverse the cause and render such judgment as ought to have been reached in the first instance, or reverse and remand for new trial.

2. **Same.**

Record examined; held, to be insufficient to support the judgment.

(Syllabus by Stephenson, C.)

Commissioners' Opinion, Division No. 4.

Error from District Court, Okfuskee County; John L. Norman, Judge.

Action by Billie Franklin against G. M. Castle and E. E. Parsons to quiet title in real estate. Judgment for defendants. Plaintiff brings error. Reversed and remanded for new trial.

Wellington L. Merwine, John L. Newhouse, and Phillips & Douglas, for plaintiff in error.

Huddleston & Stephenson, for defendants in error.

Opinion by STEPHENSON, C. This is an equitable proceeding commenced by the plaintiff to quiet title to certain real estate allotted to him as a Creek freedman. This appeal presents the question of the sufficiency of the evidence to support the judgment in favor of the defendants. It is claimed by the plaintiff that the deed offered in evidence by the defendants was forged. The alleged conveyance of land by a freedman is a common occurrence and frequently happens in the first few hours, and even in the first few minutes after he attains his majority. If this testimony was found in a different setting from the present case, and was shorn from the several out of the ordinary incidents connected with this transaction, we would reach a different conclusion. The known natural tendency of a freedman to sell and convey his allotment as soon as he can do so legally, when considered with a deed purported to have been executed and delivered by the allottee, ordinarily makes a stronger showing than the denial of the execution of the same by the freedman. A negro lawyer, Martin, was representing a client from whom the allottee was borrowing $400, and giving his mortgage on the land in question to secure payment. Martin and the plaintiff, according to their testimony, reached Okemah about 11 o'clock a. m. on August 23rd. The plaintiff then went to an abstract office to have his abstract extended for inspection by the lawyer in connection with making the loan. On this date the plaintiff and several of his brothers and sisters were desired at Okemah by an attorney for conference in connection with the institution of a suit for them, for the recovery of land allotted to their deceased mother. Upon the arrival of the plaintiff at Okemah, he immediately went to the abstract office and arranged for the completion of his abstract. According to Martin, the two then went down near the Broadway Hotel, where they watched paving work for about 20 minutes. The plaintiff left Martin at this place and went up town. The plaintiff testified that he went to the abstract office and there secured his completed abstract. Martin testified that he came back on the street in about 20 or 25 minutes, where he found the plaintiff with his abstract and then they got in witness's car and returned to Boley, leaving Okemah about 12 o'clock. The plaintiff testified that he went to the attorney's office where he found two or three of his brothers and sisters and discussed the bringing of the law suit for some 5 or 10 minutes. Plaintiff then went to the abstract office and secured his abstract and observed a tax deed wherein the grantee's name was similar to the name of the lawyer he had just left. He then returned to see the attorney he had first called on, who advised that he was not the party named as grantee in the deed. It appears reasonably clear that some 20 or 25 minutes was used between the abstract office and the lawyer's office by the plaintiff in connection with the proposed suit. On these questions the plaintiff is abundantly supported by the evidence of his brothers and sisters. The defendants did not call to the stand the attorney whom the plaintiff visited. After the plaintiff and witness, Martin, had returned to Boley on August 23rd, the plaintiff executed and delivered a mortgage on his land for the loan of $400. As the plaintiff claimed that he did not have any money, the mortgagee paid him $39, or gave him a small check for $39, and the remainder of the loan in another check. The plaintiff immediately secured the cash on the small check. The following morning the plaintiff went from Boley to Weleetka and from the latter place to Beggs. The plaintiff then went from Beggs to Sapulpa, where he testified that he placed the check with a bank for collection, receiving an advancement of $50. The negro attorney, Martin, returned to Okemah on the morning of the 24th, and upon examination of the records found that a deed of conveyance from the plaintiff to G. M. Castle for the land covered by the mortgage had been filed on that morning, just prior to his reaching the county clerk's office. Then followed the plaintiff's arrest at Sapulpa in connection with the giving of the mortgage, and he remained there in jail for some few days. As soon as he got out of jail he secured the services of an attorney and went to Okemah to investigate the deed transaction. G. M. Castle and his partner, H. B. VanPelt, testified that the plaintiff was in their office on August 23rd, and executed and delivered to Castle the deed in controversy here. The grantee testified the plaintiff came to his office with an abstract and the entire transaction was completed in about 30 to 45 minutes. The grantee testified that he met the plaintiff in Okmulgee some three or four months prior to this date, at which time he discussed with plaintiff the question of purchasing his land, but that no understanding was reached. He had not seen the plaintiff, according to his testimony, in about 7 or 8 years before meeting him at Okmulgee. The father of the grantee, who testified to the execution of the deed, stated he had not seen the plaintiff in about 14 years. H. B. Van-

Pelt, a partner of the grantee, and his father, J. B. VanPelt, testified that they were present when the deed was executed by the plaintiff. H. B. VanPelt testified that his father gave to him a check payable to himself in the sum of $4,000, drawn on the First National Bank of Okemah, to pay the purchase price. The partners and their fathers testified that Dr. Pemberton and a party by the name of Andy Higgins were in their office at the time the deed was executed. Counsel for defendants stated that they would use Andy Higgins in rebuttal, but he was not used as a witness in the case. Dr. Pemberton testified in the case, in part, as follows:

"Q. Were you in their office sometime along about the middle of August last year when they were making a trade with a negro for some land? A. Yes, sir. Q. Do you remember who else was there? A. Yes, sir. I remember I was there when a negro signed a deed for a piece of land. Q. Do you remember his name? A. No, sir. Q. Would you know the man that signed the deed if you seen him? A. No, sir. Q. This is the man that is alleged to have signed the deed, Billy Franklin, sitting there with the white collar on (pointing to plaintiff) ; state whether or not that is the party that was in there? A. I don't remember."

W. E. Rice, who held some position in the Citizens National Bank, took the acknowledgment to the deed, and testified in part as follows:

"Q. On or about that time, Mr. Rice, I will ask you if you can recall having gone to the office of G. M. Castle and H. B. Van-Pelt and took the acknowledgment of a negro? A. I went up there sometime and took an acknowledgment. I don't know about the date. Q. Do you remember whether or not they called him Billy Franklin or not? A. No, I don't remember. Q. Did you know the negro personally, yourself? A. No, sir. Q. The boy sitting over there is admitted by all parties to be Billy Franklin, do you know whether or not that is the man whose acknowledgment you took that day? A. No, sir; I don't know. Q. You couldn't say? A. No, sir."

VanPelt testified that he took the plaintiff over to the First National Bank and secured the $4,000 on the check which was payable to VanPelt, and delivered this sum of money to the plaintiff in the bank.

Ed Clowers, the assistant cashier, paid the check, and in connection with the transaction testified in part as follows:

"Q. Do you know B. H. VanPelt? A. Yes, sir. Q. Did you know him on or about the 23rd day of August, 1920? A. Yes, sir. Q. Did he come into the First National Bank with a negro on or about that time

and get a check cashed? A. Yes, sir. He came there. Q. For what amount? A. $4,000. Q. What did he do with the $4,000? A. He gave it to the negro, I guess. Q. Did he give it to the negro? A. They took it back in the Bank and gave it to the negro. The negro had the money, I guess they gave it to him."

It is clear from the evidence of the witness, Clowers, that he did not see VanPelt pay the money to any person. Ordinarily the vendee of land for which $4,000 has been paid desires some written evidence bearing the signature of the grantor that the latter received the money. This is the usual course of persons having experience in the purchasing of lands from freedmen allottees. The natural act of VanPelt would have been to have handed the money to the negro there in the presence of the witness, Clowers, since he had not taken written evidence from the grantor for the payment of the money. Instead of pursuing the normal handling of the matter, it appears that VanPelt took the negro, who was with him, to some portion of the bank, beyond the observation of Clowers, or any other disinterested party, and there made the supposed payment. The inference is that men of normal mentality have good reason for varying the usual handling of some particular matter. It appears the plaintiff was offered $6,000 for his land at Boley, on the morning he went to Okemah. One of the witnesses for the defendant testified the plaintiff advised them there in the office that he had been offered $6,000 for his land, but that the purchaser desired to pay half cash and the balance by a mortgage on the property. The witness testified that the plaintiff stated he preferred to have all cash for the land. This action was commenced against the defendant some 8 or 10 days after the filing of the alleged deed for record. The defendants had notice thereby that their title through the deed was questioned. If the deed was in fact executed by the plaintiff they must have realized when the suit was filed, its importance to them for use in the trial of the case. The plaintiff made demand on the defendants in February for an inspection of the deed. The defendant failed to meet this requirement at any time and the original deed was not introduced in evidence. This case was first set for trial in the first days of May following the filing of this suit in September. The defendants offered in evidence the receiving record of the county clerk's office, which shows the receipt of the deed for filing by the office, but the space for showing a record of the return of the deed is in blank. The defendants

attempted to show and testified they did not receive the deed from the clerk's office. David Cline, who was the attorney for the defendants at the time the case was set for trial in the first days of May, asked the attorney for plaintiff for some 10 days continuance, advising that if the continuance was granted, he would make a thorough search in his office, and the office of the defendants for the deed in question. It had not been suggested prior to this time that the deed had not been received from the county clerk's office. So far as this record shows, the defendants made no inquiry at the county clerk's office for the deed or concerned themselves as to its whereabouts, prior to the date this cause was first set for trial in May. The grantee, Castle, and VanPelt, his partner, testified that the plaintiff came to their office with the abstract to the property in question. It is not out of the ordinary for a person to purchase land from a freedman without an abstract, but it would be out of the ordinary for the usual purchaser to permit the grantor to retain a complete abstract he then had to the land for which the allottee had no apparent use. It was a natural incident according to plaintiff's testimony and that of the witness, Martin, for the plaintiff to return to Boley with the abstract as the abstract was made in the first instance, according to the undisputed testimony, for use in connection with securing a loan on the land. There is no evidence that the plaintiff had any sums of money at Boley other than the $39 paid to him by the mortgagee. There is no evidence of plaintiff having used or spent any sums of money other than the mortgage loan, at or near the time of the alleged execution of the deed. Even if this negro had defrauded his mortgagee in securing the loan, after his guilt was discovered, his natural course in the matter would have been to satisfy the mortgagee by repayment of the loan. It is not reasonable that the plaintiff would have permitted himself to be placed in jail on a charge of defrauding the mortgagee, when he had some $3,500 or $4,000 available for satisfying the mortgagee. In weighing the circumstantial evidence on both sides of this action, aside from the direct testimony of the parties, we are lead to the conclusion that the judgment of the court is against the reasonable inferences to be drawn therefrom. We will refrain from a general analysis of the impressions we gather from the evidence as a whole, as this case is to be reversed and remanded for new trial. Either or both parties may be able to clarify their respective contentions in a new trial. In considering this appeal we are governed by the equitable rules that this court will consider and weight the evidence, and if the judgment is against the clear weight, such judgment as ought to have been found in the first instance, will be entered here, or the cause be reversed and remanded for new trial. Harris v. International Land Co., 89 Okla. 163, 213 Pac. 845.

It is recommended that this cause be reversed and remanded for a new trial.

By the Court: It is so ordered.